UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERITA P. BROWN,

              Plaintiff,

       vs.

DTE ENERGY CORP.
SERVICES, LLC,

              Defendant.

_____/

Case No. 21-CV-11412

HON. GEORGE CARAM STEEH

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [ECF NO. 18]

This employment action was filed by plaintiff Sherita Brown ("Brown")

against her employer, defendant DTE Energy Corporation Services, LLC ("DTE").

Brown claims she has been subjected to adverse employment actions due to

race, age, disability and/or use of FMLA leave. Brown filed a complaint in state

court on April 9, 2021, alleging discrimination, retaliation and hostile work

environment in violation of the Michigan Elliott Larsen Civil Rights Act ("ELCRA"),

MCL 37.2201, et seq., and discrimination and retaliation in violation of the

Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 31.1202 et seq. On

May 10, 2021, plaintiff filed a First Amended Complaint to include alleged

violations of the Family Medical Leave Act ("FMLA"), 9 U.S.C. §2611 et seq. and

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.

Defendant removed the case to federal court on June 16, 2021. The matter is

before the court on DTE's motion for summary judgment (ECF No. 18).  Upon a

careful review of the written submissions, the court deems it appropriate to

render its decision without a hearing pursuant to Local Rule 7.1(f)(2).  For the

reasons set forth below, defendant's motion for summary judgment is

GRANTED.

<u>FACTUAL BACKGROUND</u>

Sherita Brown is an African American woman over 60 years old. Brown

was first hired as a Customer Service Representative at MichCon in 1981.

Following the merger of MichCon and DTE Energy in 2001, she became a DTE

employee. Brown bid on and was selected for a promotion to Assigned Account

Analyst ("AAA") in the Major Account Services ("MAS") Department. As an AAA,

Brown's job was to assist and support Account Managers in MAS with handling

customer issues such as outages, turn-ons and billing questions. Brown primarily

supported Account Manager Steve Harris. From approximately 2016 through

2018, Brown reported to Manager Ron Ingrody. Ingrody reported to MAS

Director, Yvette Johnson.

One of Brown's allegations is that DTE has failed to promote her to the

positions of Senior Account Analyst or Associate Account Manager because of

her age and race. Brown admits that although the job of Senior Analyst was posted for bidding in 2017, she did not apply. (Brown dep., pp. 23, 35-37). The two employees selected for the position, Teresa Spencer and Penny Woolfolk, were both African American. Ms. Woolfolk is also five years older than Brown.

Brown's claimed disability is a sensitivity to certain fragrances. Brown says she began experiencing a sensitivity to perfumes, body oils and soaps starting in 2013. Brown first saw a doctor about her sensitivity in 2017. Dr. William Solomon prepared a medical report dated May 9, 2017, requesting an accommodation for Brown. Brown worked in a cubicle on the fifth floor of the DTE downtown headquarters building. On May 23, 2017, she submitted an ADA accommodation request using DTE's online system. At that time, her requested accommodation was as follows:

> There is one (1) employee who sits two aisles over that wears a scented products that causes a allergic reaction. This employee has been spoken to several times from Different Managers concerning this issue. Employees around this employee has complained also. Please address this issue with this employee.

(Brown dep., pp. 45-46).

Brown testified that this accommodation request specifically pertained to an employee named Robin Washington, who sat two aisles away from her and had some sort of oil bottle on her desk. In response to Brown's accommodation request, a representative from the DTE ADA Committee

provided MAS leadership with materials for conducting scent awareness training on their floor, including a scent awareness policy, talking points for employee discussions and posters. The training instructs employees to be aware that exposure to scents may adversely affect others, instructs them not to apply any scented products in the workplace, and tells them to only apply scented products at home such that they cannot be detected in the workplace at more than about an arm's length. The representative testified she did not recall having any conversations directly with Brown, nor did she visit Brown's work area. Director Johnson also did not talk to Brown or visit the work area. Brown claims that the training had little impact on Robin's use of scent, but it was no longer an issue after Robin left MAS later in 2017.

At some point in 2017, Brown says she experienced an issue with the perfume of another employee, Kim Krasnodemski (now Kim Salcerdo-Thompson, hereinafter "Kim"). During the latter part of 2017, Brown says she spoke directly to Kim about toning down her fragrance, to no avail. Kim says Brown periodically yelled at her about the smell and invited other employees to come down the row and smell her. Kim eventually stopped wearing any perfume, had her coat dry cleaned to remove any scent and only used Nivea lotion that Brown had given to her. Kim also sent several emails to Manager Ingrody, complaining that Brown was harassing her about perfume, even after she had stopped wearing it. Ingrody

- 4 -

asked Brown to be more respectful. Ingrody and Yvette Johnson also observed

that men in the same row, including Steve Harris who sat as close to Plaintiff as

Kim, occasionally wore too much cologne. Plaintiff insisted she was not bothered

by those scents – it was only Kim's scent that caused her a problem.

According to Brown, on July 24, 2018, Kim's scent was strong and Brown

commented about it to a co-worker. Brown alleges that Kim started an argument,

while Kim says that Brown started the argument by accusing Kim of wearing

perfume. Manager Edwin Peart, heard the commotion and came to investigate.

Peart observed Brown yelling at Kim in a loud and hostile manner, to the point

where he had to ask Brown several times to calm down. He eventually asked her

to leave the area and sit in his area. Neither Ingrody nor Johnson witnessed the

argument between Brown and Kim, but Peart reported what had transpired to

Johnson. On July 26, 2018, Ingrody issued a written reminder to Brown for

disrespectful, argumentative behavior towards her co-worker. Kim was not given

a discipline. The discipline remained in Brown's record for one year.

During the disciplinary proceeding, Brown alleges that Ingrody treated her

with hostility and hollered at her. She contends that Ingrody hollered at her on

two other occasions as well. Brown testified that Ingrody yelled at her and said

"he was sick of me complaining about the perfume and that – that he was not

going to change my seat." (Brown dep., pp. 77-78). Following the argument with

Kim and the humiliation Brown endured at being yelled at by Ingrody, Brown took a medical leave of absence for a psychological disability under FMLA from July 26, 2018 through October 7, 2018. Brown's first request for intermittent FMLA leave was in 2015 so she could care for her mother who has Alzheimer's. Almost every year since then, she has applied for FMLA to care for her mother. The 2018 request for FMLA was for herself due to anxiety and depression. Brown has never been denied any of her requests for FMLA leave.

On August 1, 2018, while on FMLA leave, Brown submitted her second accommodation request asking that she be relocated to a cubicle away from "an employee who wears perfume." It is undisputed that Kim is the employee referred to in the 2108 accommodation request, which states in part:

> I would like to move my seat as far as necessary away from my current area away from an employee who wears perfume. The seat that was offered to me is kiddie corner to my current seat, which is an open front desk, high traffic area, noisy, right at the elevators and very disturbing. I talk to customers daily and it will be a distraction. Previous employees sat there and moved because of the noise and the distractions. I've asked management to please move my seat to another area not far from my current seat but to no avail I was ignored. . . .

(ECF No. 18-18, PageID.348).

Denise Murillo was the disability liaison for DTE who reviewed Brown's 2018 accommodation request. Murillo acknowledged that she talked to Ingrody on the phone but did not meet with Brown or visit her work area. (Murillo dep., p.

16). After Brown's 2018 accommodation request was denied, Brown sent Murillo an email explaining the problem with the new location and advising her there were other empty desks available. In this email she explained that:

> the seat is near the elevator where I would still be able to detect perfume smells because employees walking past my desk to go to the ladies room, the kitchen and conference rooms. Also, the noise form [sic] the elevator, employees talking, walking and people stopping at my desk thinking I'm the admin. . . .

ECF No. 19-25, PageID.829

On September 5, 2018, Brown filed an EEOC Complaint alleging that defendant harassed her based on her disability and did not accommodate her disability, in violation of the ADA. ECF No. 19-29, PageID.840.

On October 12, 2018, Brown filed a complaint with the DTE Ethics and Compliance Office, alleging that she was "disrespected and yelled at" by Ingrody after speaking to the Executive Director regarding her request for a new cubicle location. Ingrody allegedly said he was tired of Brown complaining about the employee wearing perfume. ECF No. 19-30, PageID.844. Brown also accused Johnson of creating a hostile work environment. The complaint file includes a statement from Brown's co-worker, Cynthia Gianino, relaying that when Gianino and Brown were talking, Johnson walked by and said, "Don't listen to her pity party." ECF No. 19-30, PageID.856. The Ethics office investigated but did not substantiate harassment by Ingrody or Johnson. ECF No. 19-30, PageID.846.

In December 2018, Brown was transferred from MAS to Customer Service. She retained her title and salary. Brown alleges that her transfer was retaliation for bringing the Ethics Complaint. The explanation given by DTE for the transfer was that the numerous billboard accounts Brown supported as an AAA were being moved from MAS to Customer Service. This decision was made as part of a study that Johnson had been doing in MAS since June 2018. Brown was the only person who handled billboard accounts in MAS, so she was transferred to Customer Service to continue assisting the billboard customers. It was also thought that she could assist with a backlog of rate studies in Customer Service. Johnson met with Customer Service Manager, Sherry Stevens, to discuss movement of the billboard accounts and transfer of Brown on August 23, 2018. These actions took place prior to Brown's return from leave and prior to her filing the Ethics complaint on October 18, 2018.

Brown states that when she was moved to Customer Service the "prestigious" Bedrock account was no longer her responsibility. Brown contends she never asked to be moved out of MAS and states she viewed her move to Customer Service "like a slap in my face because I started in Customer Service; why would I want to go back after being there from 1981-2005." (Brown dep., p. 308).

Brown went on an approved medical leave for a bronchitis infection from January 31, 2020 to February 28, 2020. Brown was on an approved leave for Covid 19 from April 27, 2020 to June 5, 2020. Brown was on an approved medical leave for depression and anxiety allegedly brought on by her transfer to Customer Service, from October 5, 2020 to February 2021. When Brown returned to work, she was given a "Does Not Meet" 2020 Performance Review. Brown disputed her 2020 Performance Review, and on September 28, 2021, defendant reversed it to "Fully Meets" expectations.

Brown alleges that her pay and promotional opportunities have been negatively impacted by her transfer to Customer Service. She can no longer work overtime and she has not been promoted to Associate Account Manager or Senior Analyst. Finally, Brown asserts alleges that all the new AAAs, Associate Account Managers and Senior Analysis hired in MAS after she was transferred have been younger employees.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d

530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

ANALYSIS

## I.    Age and Race Discrimination

In her discrimination claim, Brown alleges that DTE failed to promote her, gave a written reminder, and transferred her to Customer Service on account of her age and race. Brown acknowledges that none of her supervisors in MAS or Customer Service ever made any derogatory age or race-based comments to or about her. (Brown dep., pp. 116-117, 223). In the absence of direct evidence of age or race bias, a plaintiff's claims must be analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Brown must first establish a prima facie case of race and age discrimination by showing

that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position held; and (4) she was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009).

Once the plaintiff states a prima facie case, the defendant can rebut the presumption of discrimination by producing evidence that the employment actions were taken for a legitimate, nondiscriminatory reason. The burden then shifts to plaintiff, who must show that defendant's proffered reason was a pretext for discrimination. Plaintiff can show pretext by showing that the proffered reasons: (1) had no basis in fact; (2) did not actually motivate defendant's action; or (3) were insufficient to motivate defendants' actions. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

Brown asserts that she suffered three adverse employment actions. She first claims that she was not promoted to the position of Associate Account Manager or Senior Analyst. However, Brown admits she never bid on those positions. Failing to bid on the job is fatal to a failure to promote claim. *See e.g.*, *Nguyen v. City of Cleveland*, 229 F.3d 559, 564 (6th Cir. 2000). Moreover, at least two of the individuals identified as having been selected for promotion to Senior Account Analysts, Teresa Spencer and Penny Woolfolk, are African

American and Woolfolk is five years older than Brown. Brown's allegation that she was not given a promotion does not qualify as an adverse employment action for her prima facie case of discrimination.

The next adverse employment action asserted by Brown is that she was given a written reminder for disrespectful, argumentative behavior toward a co-worker. "In order to be actionable, an employment action must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities." *Chen v. Wayne State Univ.*, 284 Mich.App. 172, 201 (2009). Brown admits she had an argument with Kim. Although she believes the written reminder was unjust because she thinks Kim started the argument and should have received a discipline, Brown suffered no material adverse consequence from receiving a written reminder. It remained active in her file for 12 months and has since expired.

The final adverse employment action alleged by Brown is her transfer to Customer Service. Brown describes that the transfer back to Customer Service where she started years ago was an insult to her. She also indicates that she lost out on overtime opportunities, because the Customer Service department did not have a special storm duty like there was in MAS. An adverse employment action must be more than a "bruised ego," a "mere inconvenience," or an "alteration of job responsibilities." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir.

2010) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc)). The Court must consider "whether an action resulted in a plaintiff receiving a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation, along with other markers of prestige and desirability." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 607–08 (6th Cir. 2019) (internal quotation marks omitted) (quoting *Spees*, 617 F.3d at 391). Here, Brown was given a lateral transfer doing the same or similar work, for the same salary. Although she did not have the same opportunity to work storm overtime in her new position, and considered her transfer to be an insult, on its fact the transfer is not a materially adverse employment action. *Darnell v. Campbell County Fiscal Court,* 731 F.Supp. 1309, 1313 (E.D.Ky.1990), *aff'd,* 924 F.2d 1057 (6th Cir.1991) ("[b]arring unusual circumstances, ... a transfer at no loss of title, pay, or benefits does not amount to ... [an] adverse employment action.")

Even if the written reminder or job transfer could be considered materially adverse employment actions, Brown cannot demonstrate that defendant's proffered legitimate non-discriminatory reasons for taking these actions were a pretext for race or age discrimination. Regarding the written reminder, the only member of management who observed the incident was Edwin Peart and he saw Brown standing over Kim's cubicle behaving in a sufficiently hostile manner that

- 14 -

he had to repeatedly ask her to calm down and remove her from the location. It is true that Kim is not African American and is younger than Brown, but there is no evidence that Kim engaged in similarly aggressive behavior. In addition, Brown's supervisor, Ron Ingrody, knew that Kim was on the receiving end of aggressive behavior from Brown in the past and had informally counseled Brown about it prior to the incident that led to the written warning. There is no evidence that management was not motivated by the belief that Brown was the aggressor and that a written warning was warranted under the circumstances.

There is likewise no evidence that Brown's transfer to Customer Service was pretext for discrimination. Johnson attested to the business rationale for transferring the billboard accounts while also offering Brown the opportunity to continue to work with those customers and help Customer Service with a backlog of rate studies. The idea was the result of an assessment of MAS that began in June 2018, prior to Brown's discipline or her ethics complaint. There is no evidence to support Brown's theory that her transfer was a pretext for race or age discrimination

DTE's motion for summary judgment on Brown's claims of discrimination based on race and age is granted.

## II.    Age and Race Hostile Work Environment

To establish a prima facie hostile work environment claim under ELCRA,

Brown must show that: (1) she belonged to a protected group; (2) she was

subjected to communication or conduct on the basis of her protected status; (3)

Brown was subjected to unwelcome . . . conduct or communication involving her

protected status; (4) the unwelcome . . . conduct was intended to or in fact did

substantially interfere with Brown's employment or created an intimidating,

hostile, or offensive work environment; and (5) respondeat superior. *Quinto v.*

*Cross & Peters Co.*, 451 Mich. 358, 368–69 (1996). The second element of the

test requires a finding that but for the protected status, the plaintiff would not

have been the object of harassment. *Haynie v State*, 468 Mich. 302, 309 (2003).

Whether the unwelcome conduct rises to level of a hostile work environment is

determined by "whether a reasonable person, in the totality of circumstances,

would have perceived the conduct at issue as substantially interfering with the

plaintiff's employment or having the purpose or effect of creating an intimidating,

hostile, or offensive employment environment." *Id*. at 369 (quoting *Radtke v.*

*Everett*, 442 Mich. 368, 392 (1993)).

Brown has not identified anyone who has made any derogatory age or

race- based comments to or about her. At most, Plaintiff believes Ingrody was

"mean" when he accused her of starting the argument with Kim and "yelled" at

- 16 -

her when he allegedly told her to get to her new cubicle location and that he was tired of her complaining about Kim's perfume (Brown dep., pp. 247-249). She also believes that Johnson was mean to her when she made a comment about Brown not pulling another employee into her "pity party." (Brown dep., p. 325).

None of Brown's allegations rises to the level of conduct that constitutes race or age-based harassment sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. *See, Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir.2007) ("Although the question of whether conduct is severe or pervasive is quintessentially a question of fact, [the Sixth Circuit] ha[s]...affirmed grants of summary judgment, determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive.").

DTE's motion for summary judgment on Brown's claims of hostile work environment under ELCRA is granted.

## III. Disability Discrimination and Retaliation

The PWDCRA prohibits discrimination based on an individual's disability, defined as a "determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the

duties of a particular job or position." MCL 37.1103(d)(i)(A). Brown alleges that she suffers from two disabilities that are protected by the PWDCRA - scent sensitivity and anxiety and depression.

As it relates to her scent sensitivity, Brown testified that her nose and eyes run and she sometimes gets headaches when exposed to scents (Brown dep., p. 309). Brown submitted two requests for accommodation related to her scent sensitivity, each supported by a note from her doctor. Brown identified the perfume worn by Kim and former employee Robin as the scents that bothered her at work. Brown did not present any evidence of having to leave work, take FMLA/disability time, or require medication or treatment associated directly with her scent sensitivity condition. For purposes of this motion for summary judgment, the Court assumes that Brown's scent sensitivity qualifies as a disability under the PWDCRA. The Court also assumes that Brown's anxiety and depression qualifies as a disability for purposes of this motion.

## A.    Failure to Accommodate

Based on Brown's testimony and her contemporaneous accommodation request forms, it is undisputed that her first accommodation request in 2017 pertained to oils on the desk of employee Robin Washington. Defendant responded by conducting scent awareness training for all employees in the department and posting reminders about minimizing use of scented products.

Brown made no further complaints or requests until August 1, 2018, after she was given the written reminder for arguing with Kim.

In the second request for accommodation in 2018, Brown specifically asked to be relocated away from Kim, who she identified as the employee who sits "kiddie corner" to her. Plaintiff's desk was thereafter relocated to the next aisle. The move was effective with respect to getting her away from Kim, who Brown unequivocally acknowledges was the only person whose fragrance bothered her as of 2018. However, Brown objected to the offered accommodation on other grounds, being that it was near the elevator, which was loud and distracting, and that she "would still be able to detect perfume smells because employees walking past my desk to go to the ladies room, the kitchen and conference rooms." ECF No. 19-25, PageID.829

The accommodation provided addressed the scent sensitivity issue that was, by Brown's admission, exclusive to the perfume worn by one person – Kim. Brown's belief that she "would still be able to detect perfume smells" was speculative and not the subject of her accommodation request. The 2018 accommodation request stated that Brown wanted to be relocated to the back of the room because the front location by the elevator had too many distractions. Brown has not provided any evidence to substantiate that she has a disability related to concentration. The PWDCRA provides a right to reasonable

accommodation, not to the employee's preferred accommodation. *Chavez v. Waterford Sch. Dist.*, 720 F. Supp. 2d 845, 857 (E.D. Mich. 2010) ("[A]n employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided.").[1]

There is no issue of fact that defendant provided Brown with a reasonable accommodation for her disability.

## B. Disability Discrimination

Brown contends that defendant gave her a poor review because of the time she was out of the office on disability leave based on depression and anxiety. Brown's 2020 Performance Review stated that she was unable to perform her job duties and was out of the office 70% of the time. To pursue a discrimination claim under PWDCRA, Brown must show (1) that she is disabled as defined in the act, (2) that the disability is unrelated to her ability to perform her job duties, and (3) that she has been discriminated against in one of the ways delineated in the statute. *Peden v. City of Detroit*, 470 Mich. 195, 204 (2004). Once a plaintiff has proven that she is a 'qualified person with a disability, she must demonstrate that the defendant took adverse action based on her disability. *Id.*, at 205. Consistent

---

[1] While *Chavez* addressed the requirements under the ADA, it recognized that the Sixth Circuit has held that the ADA and PWDCRA "substantially mirror" each other and resolving a claim under one statute will generally resolve a claim under the other. *Chavez*, 720 F. Supp. 2d at 854.

with *McDonnell Douglas*, the defendant must then provide non-discriminatory reasons for the adverse action. Plaintiff must then show a material question of fact as to pretext. *Id*.

While defendant did give Brown a poor performance review in 2020, Brown disputed that review, and on September 28, 2021, defendant ultimately reversed it to "Fully Meets" expectations. Corrective action was taken so this performance review does not support Brown's discrimination claim.

## C.   Retaliation

To establish a prima facie case of unlawful retaliation under § 602(a) of the PWDCRA, a plaintiff must show: (1) that she engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Bachman v. Swan Harbour Assoc.*, 252 Mich. App. 400 (2002); *Mitan v. Neiman Marcus*, 240 Mich. App. 679, 681(2000). To establish a causal connection, a plaintiff must demonstrate that her participation in the protected activity was a "significant factor" in the employer's adverse employment action. *Barrett v. Kirtland Comm. College*, 245 Mich. App. 306, 325 (2001). Mere discriminatory or adverse action will not suffice as evidence of retaliation unless plaintiff can demonstrate a clear nexus between such action and the protected activity. *Mitan*, 240 Mich. App. at

681-682. If plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate business reason for the action. *Roulston v. Tendercare (Michigan), Inc.*, 239 Mich. App. 270 (2000). Once such a reason is provided, the burden shifts back to the plaintiff to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for retaliation. *Id*.

Brown contends that the adverse action of transferring her to Customer Service was in retaliation for her engaging in protected activity. The protected activity was advising DTE in 2017 and 2018 that she required accommodation due to scent sensitivity. Brown states that there is a causal connection between her requests for accommodation and her transfer to Customer Service because she was not transferred until she asked for the accommodation and then took a work-related medical leave related to her psychological condition.

However, as discussed above, Brown was given a reasonable accommodation after each of her two accommodation requests related to her scent sensitivity. She was also granted each of her medical leave requests. Therefore, none of these requests support her retaliation claim. Brown's EEOC Charge was not filed until May 2019, five months after she had been moved to Customer Service and therefore cannot form the basis of her retaliation claim.

- 22 -

Furthermore, defendant had a legitimate business reason for transferring Brown to Customer Service so she could follow the transfer of her billboard accounts. Johnson was contemplating Brown's transfer prior to her argument with Kim and her written reminder, so those incidents do not support Brown's pretext argument.

DTE's motion for summary judgment on Brown's claims under the PWDCRA  is granted.

## IV.   Family and Medical Leave Act

### A.   FMLA Interference

To establish a claim for interference under FMLA, Brown must demonstrate that (1) she is an eligible employee, (2) defendant is an employer as defined under the FMLA, (3) Brown was entitled to leave under the FMLA, (4) Brown gave defendant notice of her intention to take leave, and (5) defendant denied Brown FMLA benefits to which she was entitled. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016).

The fifth element of a prima facie case for interference under the FMLA is that the defendant denied benefits which the plaintiff was entitled to receive. The gist of Brown's FMLA interference claim is that when she returned from her approved FMLA leave in October 2018, she was subjected to harassment by management, and then on December 22, 2018 she was moved to Customer

Service which she deems to be an undesirable DTE department. While Brown has never been denied a request for FMLA leave, she asserts that defendant interfered with her FMLA rights which require an employer to reinstate an employee to her prior position or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).

With respect to Ingrody's alleged "mean" comment, Brown's testimony is that when she attempted to return from leave in September 2018 and complained that she was not satisfied with the new desk location Ingrody had given her, he told her to move her things to the new desk and that he was sick of her complaining about the perfume and was not going to change her seat again. (Brown dep., pp 77-78). Even assuming this was said, it is an isolated comment related to Brown's dissatisfaction with the accommodation provided – not a comment related to her FMLA leave.

Brown argues that the Customer Service position was not equivalent to her AAA position in MAS because (1) her purportedly prestigious Bedrock accounts were removed, (2) she had new duties for which she was not trained, (3) she has less opportunity for promotion, and (4) she has less opportunity to earn overtime by performing storm duties. The evidence, however, does not give rise to any material factual questions on these issues. First, the Bedrock accounts were

never assigned to Brown, rather they were assigned to Account Manager, Steve Harris. As an AAA, Brown's responsibility was to provide administrative support and assist with collecting information and responding to billing or outage issues for customers assigned to Harris. Brown points to no evidence that she ever received any additional compensation or recognition for supporting Account Manager Harris on his assigned Bedrock account.

Brown also contends that she had new job duties consisting of rate studies in Customer Service. However, the undisputed evidence is that the rate studies training consisted of approximately 2- 3 days' time, that Brown only completed one-half day of that training in early 2020, and she has not taken any further training nor ever been required to perform any rate studies in Customer Service. The work Brown does in Customer Service consists of supporting the billboard accounts that were transferred from MAS to Customer Service in the same manner in which she supported them when she was assigned to MAS. (Brown dep., p. 334).

Brown next claims she has less opportunity for promotion; however, she points to no specific evidence in that regard. Significantly, Brown does not refute that the MAS Senior Account Analyst promotional opportunity to which she claims to have aspired, was posted for competitive bidding while she still worked in MAS and she did not bid on it. She cites no evidence that she attempted to bid

on any subsequent postings after her transfer to Customer Service or that she was precluded from doing so.

Lastly, Brown claims her transfer to Customer Service negatively impacted her potential overtime earnings from working storm duty. However, it is clear from her testimony that Brown has not been denied an opportunity to work storm duty in Customer Service. Rather, she requested and was not permitted to work storm duty back in MAS, (Brown dep., pp. 206-209), because employees who work in the Contact Center in Customer Service do not have separate storm assignments.

The evidence shows that Brown's AAA position was equivalent before and after she was moved to Customer Service. While Brown may think Customer Service is less prestigious (Brown dep., pp. 272-273), her job has not materially changed. *See, Berger v. Auto. Media, LLC*, No. 18-11180, 2020 WL 3129902 (E.D. Mich. June 12, 2020) (plaintiff's personal perception that one account was more prestigious than other accounts did not render her position "not equivalent.").

Even if Brown could state a prima facie case of FMLA interference, if an employer proves a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee, the plaintiff's claim will survive only if the plaintiff can "rebut the employer's reason by showing that the proffered reason had no basis

in fact, did not motivate the termination, or was insufficient to warrant termination." *Donald v. Sybra, Inc.*, 667 F.3d 757, 757 (6th Cir. 2012). While Brown was not terminated, the same pretext analysis applies to the decision to move her as part of the transfer of the billboard accounts from MAS to Customer Service. The impetus for the move to Customer Service in December 2018 was a realignment of the billboard accounts, for which planning was occurring even before Brown's 2018 FMLA leave. Brown has not demonstrated that the business reasons for moving the billboard accounts to Customer Service had no basis in fact or did not motivate the decision to transfer her along with the accounts.

### B.    FMLA Retaliation

To establish a prima facie case of FMLA retaliation, Brown must show that (1) she availed herself of a protected right under the FMLA; (2) her employer had knowledge of his protected activity; (3) she suffered an adverse employment action; and (4) there was a causal link between the exercise of her rights under the FMLA and the adverse employment action. *Edgar v JAC Products, Inc.*, 443 F.3d 501, 507-508 (6th Cir. 2006). Brown's FMLA retaliation claim is premised on both her transfer to Customer Service after her 2018 leave and her 2020 "Does Not Meet" performance rating in Customer Service.

As discussed above, Brown's 2018 transfer to Customer Service was not an adverse employment action. As to temporal causation, Brown was not on FMLA leave in June 2018, when Johnson began evaluating options for realigning work that did not warrant being handled in MAS. (Johnson dep., pp. 126-133). The evidence shows that Brown was granted leave under the FMLA each time she requested it. She took FMLA leave while she was employed in MAS almost every year since 2015 and returned each time without a change to her job responsibilities. Brown has not discredited DTE's legitimate, non-retaliatory business reason for the shift to Customer Service.

Brown's FMLA retaliation claim is also premised on her performance evaluation in Customer Service for the year 2020. In part, the performance review noted that Brown was absent for 70% of the year, a portion of which was covered by the FMLA. When Brown used DTE's internal appeal process to challenge her rating, DTE Employee Relations took corrective action, granted the appeal, and reclassified her appraisal to Fully Meets, accompanied by a retroactive salary increase and the bonus attendant with the Fully Meets rating. (Brown dep., pp. 327-328). Consequently, the 2020 Performance Review does not qualify as a materially adverse employment action.

## V.    Americans with Disabilities Act

Brown's claim under the Americans with Disabilities Act is the same as her claims under the PWDCRA and FMLA and are dismissed for the same reasons. *Chavez*, 720 F. Supp. 2d at 854.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is GRANTED and plaintiff's First Amended Complaint is dismissed in its entirety.

Dated:  August 25, 2022

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

| CERTIFICATE OF SERVICE |
| --- |
| Copies of this Order were served upon attorneys of record on August 25, 2022, by electronic and/or ordinary mail. |
| s/Brianna Sauve |
| Deputy Clerk |